## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 16 2020, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:
CHILD ADVOCATES, INC.

DeDe Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: T.J.C., Jr, C.C., and T.E.C. (Minor Children), and<br><br>T.J.C. (Father), | April 16, 2020<br><br>Court of Appeals Case No. 19A-JT-2298<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark A. Jones, Judge |

*Appellant-Respondent,*

v.

**The Indiana Department of Child Services,**

*Appellee-Petitioner,*

and

**Child Advocates, Inc.,**

*Guardian ad Litem.*

The Honorable Peter Haughan, Magistrate

Trial Court Cause No.
49D15-1901-JT-143
49D15-1901-JT-144
49D15-1901-JT-145

**Tavitas, Judge.**

## Case Summary

T.J.C. ("Father") appeals the termination of his parental rights to T.J.C., Jr., C.C., and T.C. (collectively, the "Children"). We affirm.

## Issue

Father raises three issues for our review; however, we revise and restate into a single issue of whether the evidence is sufficient to support termination of Father's parental rights.

## Facts

Father and A.C. ("Mother")[1] have four children: T.J.C., Jr., born in 2011; C.C., born in 2012; T.C., born in 2014; and C.A.,[2] born in 2015. In 2015, a domestic violence event occurred between Mother and Father.

On July 7, 2015, the Marion County Department of Child Services ("DCS") filed a petition alleging the Children were children in need of services ("CHINS"). The petition alleged, in part, that: (1) Mother and Father engaged in acts of domestic violence in the presence of the Children; (2) Mother and Father have not followed through with C.C.'s and T.C.'s asthma treatments and treatments stemming from a prior car accident; and (3) the Children have been without a stable home for the past year. The following day, on July 8, 2015, the trial court held an initial hearing and removed the Children from the home. The children were placed with their maternal great aunt.

On October 14, 2015, the trial court entered an order adjudicating the Children as CHINS pursuant to Mother's admission and Father's waiver of the fact finding hearing and entered a dispositional decree. The parental participation order required Father to: (1) participate in a home-based therapy program; (2)

---

[1] Mother's rights were terminated prior to the termination of Father's parental rights. Mother is not a party to this appeal; therefore, we will focus on facts only related to Father.

[2] C.A. is not one of the Children at issue in this appeal. C.A. was adjudicated a CHINS in another proceeding on February 6, 2019; however, at the termination fact finding hearing regarding the Children, some evidence was presented from service providers regarding things learned about Father during C.A.'s CHINS case as well. We, therefore, will focus on the facts as they relate to the Children and only provide facts regarding C.A. when relevant.

participate in a home-based case management program; and (3) continue domestic violence services with Fall Creek.

[6] As a result of the incident between Mother and Father in 2015, Father pleaded guilty to criminal confinement, a Class A misdemeanor, and served three months in jail.[3] Over the course of the CHINS proceeding, service providers also learned that Father was injured in three separate shooting incidents: once in the leg (unknown date); once in the mouth and shoulder (2017); and once in the back (2018).

[7] LaShawn Lewis, a family case manager ("FCM") with DCS, worked with Father and the Children from June 2016 until May 2018. In October 2016, Father's supervised visits resumed, and unsupervised visits ended after the Children touched one another inappropriately and shared that they watched pornography at Father's home. The Children also reported that Father slept during their visits. Due to issues with the Children, their maternal great aunt requested the Children be removed from her home in October 2016, and the Children were placed in foster care in Fort Wayne.

---

[3] Several other charges as a result of the incident were dismissed, including: battery with bodily injury to a pregnant woman, a Level 5 felony; domestic battery committed in the presence of a child less than 16 years old, a Level 6 felony; battery in the presence of a child when the victim is a member of the household, a Level 6 felony; domestic battery, a Class A misdemeanor; and battery resulting in bodily injury, a Class A misdemeanor. Father also has prior convictions for possession of marijuana, a misdemeanor, in 2010 as well as a subsequent probation violation; resisting law enforcement, a Class A misdemeanor, and possession of marijuana, a Class A misdemeanor, in 2014 as well as a subsequent probation violation.

[8] After October 2016, FCM Lewis attempted to contact Father several times; however, she was unable to reach Father, and paternal grandmother told FCM Lewis that Father moved out of state. Father also missed several hearings during the CHINS and termination process. Accordingly, in October 2016, Father was discharged from services due to non-compliance.

[9] In March 2017, the Children returned to their maternal great aunt's home; however, the Children were removed from their maternal great aunt's home in August 2017 pursuant to her request. The Children were placed with paternal grandmother. Subsequently, the Children's actions became more "aggressive," "defiant, and "destructive." Tr. Vol. II p. 72. When FCM Lewis visited the Children at paternal grandmother's home, the home was "very, very chaotic," and the Children were "arguing, bickering, [and] yelling" at one another in the confines of paternal grandmother's one-bedroom apartment. *Id.* at 73. Much of the Children's misbehavior, according to service providers, stems from lack of stability. FCM Lewis, however, has seen improvement in the Children's behaviors as their participation in services continues.

[10] In April 2017, Sherma Jackson, a home-based therapist, began working as the Children's therapist. Jackson also saw improvement in the Children, generally, and in the Children's relationship with one another. In November 2017, FCM Lewis heard from Father for the first time since October 2016. At that time, Father indicated to FCM Lewis that he would consent to paternal grandmother's adoption of the Children.

[11] FCM Jessica Downer took over as FCM in May 2018 and was unable to contact Father. In July 2018, the Children were removed from paternal grandmother's home and placed into foster care after paternal grandmother expressed that she was too stressed and unable to care for the Children.

[12] Meanwhile, DCS also began proceedings for C.A.'s CHINS case on October 23, 2018.[4] During C.A.'s CHINS case, Father was referred to therapy to deal with trauma, mental health, and anger issues.

[13] In October 2018, FCM Downer was still unable to locate Father for C.A.'s CHINS. In January 2019, FCM Downer finally heard from Father, who told FCM Downer that he was staying in Fort Wayne; however, Father still did not provide an address. Later in January 2019, while in court, Father told FCM Downer that he had been in North Dakota for several months, returned to Fort Wayne, and now lived in Indianapolis.

[14] On January 28, 2019, DCS filed a petition to terminate Father's parental rights. On February 6, 2019, Father was charged with operating a vehicle while intoxicated, a Class C misdemeanor; and operating a vehicle with a Schedule I or II controlled substance in his body, a Class C misdemeanor.[5]

---

[4] In C.A.'s CHINS case, Father missed the CHINS permanency hearing and missed twelve visits, citing a variety of reasons, including his work schedule and having to help a relative with their car. Father did not do visits with C.A. at his home due to his current living situation. In addition, FCM Downer was still unable to reach Father as late as April 2019 at the phone number he provided.

[5] Law enforcement found Father sitting behind the wheel of a stopped motor vehicle, while the engine was running, near an intersection in Indianapolis.

[15]     Father's termination of parental rights fact finding hearing was held on June 10 and 18, 2019. Witnesses testified to the foregoing facts. FCM Downer testified that: (1) FCM Downer has been unable to make new referrals for C.A.'s CHINS case because Father has not provided an address or consistent phone number; (2) the "domestic violence" between Mother and Father does not appear to still exist as Mother and Father are no longer in a relationship, tr. vol. II p. 138; (3) other conditions, such as instability of Father's housing, preclude the Children from being placed with Father; (4) DCS's plan for the Children is adoption with the foster father, who is considering adoption and has an appropriate home; and (5) Father's parental rights should be terminated in order to obtain stability and structure for the Children. According to Joyce Box, the guardian ad litem ("GAL"), the foster father is considering adoption, which she believed to be in the Children's best interests.

[16]     Michelle Ceaser, a home-based therapist with Families First, testified that she met Father in April 2019, during C.A.'s CHINS case. Father was renting a room and sharing common space with many other tenants he did not know. Father disclosed to Ceaser that Father's substance abuse history includes marijuana and alcohol use beginning at age twelve, as well as the use of ecstasy and other pills at varying times. Ceaser was never able to observe Father with C.A. because Father exceeded the number of cancellations permitted for Ceaser's observation.

[17]     Father testified that he went to North Dakota for a year and obtained a more lucrative job earning $30.00 per hour because he was told that Mother would be

receiving custody of the Children; Father's current living situation is not permanent; and Father needs help securing housing.

[18]     On August 28, 2019, the trial court entered an order terminating Father's parental rights. The trial court's order issued 104 findings of fact and conclusions thereon, including:

> 89. Father has not seen the children through DCS or service providers since 2016.
>
> 90. As of July 2019, the children will have been removed from Father's care for four years.
>
> 91. Father was aware of [the] CHINS matter, yet chose to stop parenting time.
>
> 92. Father chose to move out of state and absent himself from the children.
>
> 93. Father stopped participating in services.
>
> 94. Father's last appearance in the children's CHINS matter was July 2016. He did not attend any further hearings in their CHINS cases until June 5, 2019, nearly three years later.

Appellant's App. Vol. II p. 33. The trial court concluded that the conditions that led to the Children's removal will not be remedied; continuation of the parent-child relationship poses a threat to the Children's well-being; termination of the parent-child relationship is in the Children's best interest; and the satisfactory plan for the Children is adoption.

Analysis

Father appeals the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's best interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[6] Here, the

---

[6] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

> (a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

trial court did enter findings of fact and conclusions thereon in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[21] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A)     That one (1) of the following is true:
>
>> (i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

---

(b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

(ii)    The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.

(B) that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[22] Father "does not challenge the Juvenile Court's detailed and extensive Findings of Fact." Appellant's Br. p. 29. Instead, Father argues that the evidence is insufficient to support the trial court's conclusions that: (1) the conditions that led to the Children's removal will not be remedied and the continuation of the parent-child relationship poses a threat to the Children's well-being; (2) termination is in the Children's best interests; and (3) adoption is the satisfactory plan for the Children. [7]

## A. Reasons for Removal

[23] "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's

---

[7] In his brief, Father's three arguments in his Statement of Issues are listed as: (1) sufficiency of the evidence; (2) whether the trial court's conclusions and order are contrary to law; and (3) whether the matter should be remanded until the parental rights of C.A. are determined. Father, however, focuses the substance of his arguments on the sufficiency of the evidence as to each element of the termination statute. We, therefore, will focus on the issues Father has raised in his brief despite his categorization of the issues.

fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005)). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[24] The trial court found:

> It is highly probable that these conditions will not be remedied. The children's CHINS cases have been ongoing for over four (4) years. From the time Father was a juvenile until the present, Father has engaged in criminal behavior and behavior violating the terms of probation which resulted in his repeated incarceration. Father accepted no responsibility for his part in the violent, tumultuous relationship with Mother. Although Father claims to have made sufficient income, he still does not have housing that is safe and sufficient for the children. Throughout the life of the CHINS cases, Father has continued to neglect the children's needs for safety and stability. Father did not successfully engage in and complete the court-ordered services of a home-based therapy program and a home-based case management program. After unsupervised visits with Father, the children had begun to exhibit sexualized behaviors. The children disclosed that they watched pornography while in the care of Father, that Father would sleep while they were visiting with him, and that they would see Mother when they visited with Father. Father voluntarily chose to leave Indiana, move to North Dakota, and stop visiting his children for a long period of time. Father did not maintain contact with DCS for a

couple of years. When he returned to Indiana, his contact with DCS has been inconsistent. His visits with his other child, [C.A.], have been inconsistent. There is a substantial probability of future neglect and deprivation of the children if they were in Father's care and custody.

Appellant's App. Vol. II pp. 34-35.

[25] While it is true that the domestic violence issue between Mother and Father abated, this was not the only reason for the Children's removal and continued placement outside of Father's home. The initial CHINS petition alleged that Father and Mother were unable to provide stable housing for the Children; such was still the case at the time of the termination fact finding hearing in 2019 and after Father's one-year absence in North Dakota in 2018. Father was unable to participate in visits with C.A. at his home due to the nature of his housing. Father testified that he was still looking for permanent housing and needed assistance doing so.

[26] Moreover, Father has not seen the Children since 2016, and it has been four years since the Children were placed with Father. Father did complete domestic violence related services; however, Father stopped participating in other services, moved out of state, and failed to provide reliable contact information to DCS. Father's struggle with substance abuse is ongoing, and Father committed another substance-related offense mere months before the termination fact finding hearing.

[27] Based on the foregoing, we cannot say the trial court's conclusion that the conditions that led to the Child's removal will not be remedied was clearly erroneous.[8]

### B. Children's Best Interests

[28] In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *See In re A.B.,* 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008). In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* at 168. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *In re K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[29] The trial court found:

> e. As stated above, it is reasonably probable that the conditions that led to the removal and retention of the children from Father's custody will not be remedied, and there is reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children. Additionally, Father did not successfully complete the court-ordered services, and thus has not demonstrated an ability to effectively use those

---

[8] Accordingly, because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address whether continuation of the parent-child relationship poses a threat to the Children.

services. Also, both the FCM and the GAL believe that termination of Father's parental rights and the subsequent adoption of the children is in the children's best interests.

f. The Court finds that DCS has shown by clear and convincing evidence that termination of the parent-child relationship is in the best interests of the children.

Appellant's App. Vol. II p. 36.

[30] At the termination fact finding hearing, FCM Lewis testified that the Children's behaviors of aggression and defiance have improved as the Children have progressed through services. In 2016, during Father's unsupervised visitation, the Children had access to and viewed pornography. Father also had substance abuse issues, issues following the law, and was involved in multiple shootings during these proceedings. Father's issues have significantly impacted the Children.

[31] The testimony at the termination of parental rights fact finding hearing revealed that Father is unable to provide stability for the Children. Father disappeared for significant portions of time, and DCS was unable to contact Father. Moreover, DCS became involved with the family in 2015; yet, at the time of the 2019 termination fact finding hearing, Father had still not secured suitable housing for the Children.

[32] Father's argument that he always acts appropriately with the Children and has the potential to be a strong parent is a request for us to reweigh evidence, which we cannot do. Father's interactions with the Children are not the only

consideration in whether termination is in the Children's best interests. Father had not seen the Children since 2016, and Father's lack of stability and inability to provide for the Children over the four years of the pending matter demonstrate that Father cannot provide the Children with the permanency and stability they need.

[33] Based on the evidence presented, we cannot say the trial court's conclusion that termination of parental rights is in the best interests of the Children is clearly erroneous.

## C. Satisfactory Plan

[34] We next address the evidence regarding the plan for the Children. "DCS must provide sufficient evidence there is a satisfactory plan for the care and treatment of the child." *In re J.C.,* 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (citing Ind. Code § 31-35-2-4(b)(1)(D)), *reh'g denied.* The plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Id.* (quotations omitted).

[35] FCM Downer testified that DCS's plan for the Children is adoption and that the current foster father is considering adoption. Similarly, GAL Box testified that the foster father is considering adoption and that she supports the foster father's adoption of the Children. Sufficient evidence exists to support the finding that the plan is adoption, and this alone is sufficient to meet the

requirement that DCS has a satisfactory plan.[9] *See In re J.C.,* 994 N.E.2d at 290. We, therefore, cannot find that the trial court's conclusion is clearly erroneous.

## Conclusion

[36] The evidence is sufficient to support the termination of Father's parental rights. We affirm.

[37] Affirmed.

Riley, J., and Mathias, J., concur.

---

[9] Father's argument that, because the foster father has not confirmed he will adopt the Children, we should leave the door open for Father to parent the Children is a request for us to reweigh evidence, which we cannot do.